## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

APPA R. ADARI,

        Plaintiff,

vs.                            Case No. 3:05-cv-1052-J-32MCR

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,

        Defendant.

_____/

### MEMORANDUM OPINION AND ORDER

This cause is before the Court on Plaintiff's appeal of an administrative decision denying his application for Social Security benefits for the time period from June 2, 2001 through December 31, 2002.[1]  The Court has thoroughly reviewed the record, the briefs, and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **REVERSED** and the matter **REMANDED** for proceedings not inconsistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits ("DIB") on November 11, 2002, alleging an inability to work since June 2, 2001.  (Tr. 49-51).  The Social Security Administration ("SSA") denied this application initially and on reconsideration.  (Tr. 25-28, 28-34).  Plaintiff then requested and received a hearing before an Administrative Law Judge (the "ALJ").  (Tr. 39, 304-341).  On April 28,

_____

[1]The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 13).

2005, the ALJ issued a decision concluding Plaintiff is not disabled within the meaning of the Social Security Act.  (Tr. 16-24).  Plaintiff filed a Request for Review by the Appeals Council, and on September 24, 2005, the Appeals Council denied Plaintiff's request for review, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. 4-8).  Plaintiff timely filed his Complaint in the U.S. District Court on October 11, 2005.  (Doc. 1).

## II.    NATURE OF DISABILITY CLAIM

### A.    Basis of Claimed Disability

Plaintiff claims to be disabled since June 2, 2001, due to left knee pain, back pain, headaches, inability to concentrate, and depression.  (Tr. 60, 77).

### B.    Summary of Evidence Before the ALJ

Plaintiff was 44 years of age at the time the ALJ conducted the administrative hearing.  (Tr. 307).  He attended high school in India until the tenth grade and then received some additional technical schooling as a ship fitter.  (Tr. 66, 307).  His past work includes employment as a structural steel worker, ship fitter, pipe fitter, and rigger.  (Tr. 61, 329-30).  Plaintiff alleges he has been unable to work since June 2, 2001, due to an accident at work in which he injured his left knee.  (Tr. 60).  Plaintiff was insured for disability benefits through December 31, 2002.  (Tr. 16).

Plaintiff's medical history is set forth in the ALJ's decision.  By way of summary,[2] on June 22, 2001, Plaintiff was evaluated by Carlos Tandron, M.D. for his left knee pain at Jacksonville Orthopedic Institute.  Dr. Tandron diagnosed Plaintiff with patellofemoral

---

[2]This summary is limited to the evidence relevant to the issues on appeal.

2

contusion, rule out osteochondral defect, and knee effusion.  (Tr. 257).  Dr. Tandron

recommended Plaintiff have an MRI of his left knee.  (Tr. 257) He also noted Plaintiff

could do sedentary work only.  (Tr. 257).

An MRI taken of Plaintiff's left knee showed myxoid degeneration of the posterior

horn of the medial meniscus, but no evidence of meniscal or ligamentous tear.  (Tr.

255).  On July 27, 2001, Dr. Tandron examined Plaintiff and noted Plaintiff's

patellofemoral crepitance, with no effusion or instability of the knee.  (Tr. 254).  Dr.

Tandron recommended physical therapy three times a week for four weeks.  (Tr. 254).

Plaintiff returned to Dr. Tandron's office on August 14, 2001,  complaining of significant

pain medially.  (Tr. 253).  Dr. Tandron administered a Lidocaine/Depro-Medrol injection

for the pain and kept Plaintiff on modified work duty/sedentary work only.  (Tr. 253).

Plaintiff returned to Dr. Tandron's office on August 24, 2001, and continued to complain

of pain.  (Tr. 253).  Dr. Tandron noted tenderness over the medial femoral condyle.  (Tr.

253).  He considered performing an arthroscopy on Plaintiff, but recommended Plaintiff

first obtain a second opinion.  (Tr. 253).

On October 22, 2001, Plaintiff was examined by Hugh Switzer, M.D., for a

second orthopedic opinion.  Dr. Switzer stated:

> I reviewed his x-rays and MRI today, which were essentially normal.
> Evaluation of his knee today revealed no effusion.  His knee is stable.  His
> patella appeared to be tracking normally.  What he did have was a
> symptomatic plica, which was reproducible and very painful.  When I was
> able to palpate the popping plica and reproduce the popping sensation he
> described it as the discomfort that he has been feeling. . . . I would
> recommend at this point that it be arthroscoped and I think it would be
> markedly improved.

(Tr. 113).  Consequently, Dr. Tandron performed arthroscopy with medial plica resection and micropicking of the MFC on Plaintiff's knee on November 29, 2001.  (Tr. 279).  Dr. Tandron also placed Plaintiff on temporary total disability ("TTD") until after surgery. (Tr. 279).

Unfortunately, after surgery Plaintiff's pain did not significantly improve; it gradually worsened despite physical therapy.  (Tr. 278-277).  Dr. Tandron kept Plaintiff's work status as TTD.  (Tr. 277).  He prescribed Plaintiff Ultram for his pain.  (Tr. 276).  On February 28, March 7, and March 14, 2002, Dr. Tandron injected Plaintiff with Synvisc injections for his pain.  (Tr. 274-75).  The injections did not help alleviate Plaintiff's pain, as Plaintiff returned to see Dr. Tandron on April 26, 2002, still complaining of significant pain in his knee which radiated into his medial thigh region. (Tr. 274).  Dr. Tandron considered a Carticel reimplantation procedure, however, he was concerned it would not help Plaintiff's pain.  (Tr. 274).  He recommended Plaintiff have a bone scan of his total body and another MRI of his left knee.  (Tr. 273-74).  He also continued to prescribe Plaintiff pain medication, and left Plaintiff's work status as TTD.  (Tr. 274).

On June 7, 2002, Dr. Tandron noted Plaintiff's bone scan showed increased uptake consistent with degenerative changes, but did not show evidence of reflex sympathetic dystrophy.  (Tr. 273).  He opined Plaintiff showed signs of chronic pain and noted Plaintiff had not slept well for the last couple months.  (Tr. 273).  He recommended a second opinion and continued Plaintiff's work status as TTD.  (Tr. 272).

Plaintiff began treatment for his pain at the Metropolitan Pain Management

4

Center on July 26, 2002, with Ismail D. Salahi, DO.  (Tr. 157).  Dr. Salahi noted Plaintiff

described constant pain with burning or cold sensations at times.  (Tr. 150).  He also

noted standing and sitting aggravated Plaintiff's pain.  (Tr. 150).  Dr. Salahi diagnosed

Plaintiff with patellofemoral pain syndrome.  (Tr. 151).   On July 31, 2002, after

reviewing Plaintiff's MRI and bone scan, Dr. Salahi again confirmed his diagnosis of

patellofemoral pain syndrome, but also questioned whether Plaintiff had reflex

sympathetic dystrophy ("RSD").  (Tr. 149).

Dr. Salahi injected Plaintiff with sympathetic blocks on August 6 and August 13,

2002.  (Tr. 118-19).  On September 4, 2002, Plaintiff returned to Metropolitan Pain

Management Center and Dr. Salahi noted the sympathetic injections were of no value,

but Plaintiff reported some improvement with his pain medication.  (Tr. 146).  Thus, Dr.

Salahi planned to treat Plaintiff with medication management.  (Tr. 146).  On October

16, 2002, Plaintiff returned to Dr. Salahi complaining of intense burning and increased

pain in his left knee.  (Tr. 145).  Dr. Salahi diagnosed Plaintiff with causalgia[3] of the

lower left extremity.  (Tr. 145).  Dr. Salahi also opined Plaintiff had reached maximum

medical improvement ("MMI") as to his work related injury.  (Tr. 145).  He further opined

Plaintiff had a 5% impairment rating and Plaintiff was capable of light work, with no

prolonged standing.  (Tr. 145).

After several other medical appointments, including one with a psychologist,

Plaintiff returned to Dr. Tandron on March 4, 2003, and continued complaining of pain.

---

[3]Causalgia is defined as "persistent severe burning of the skin usually following direct or indirect trauma to a sensory nerve, accompanied by cutaneous changes."  See MediLexicon website, www.pharma-lexicon.com/searches/medterms.php (last visited on Aug. 21, 2006).

(Tr. 271).  Plaintiff felt pain management was not helping.  (Tr. 270).  Dr. Tandron observed atrophy of Plaintiff's calf and quadriceps on his left leg and questioned whether Plaintiff was suffering from RSD.  (Tr. 270).  He recommended ongoing pain management and suggested reevaluation by another pain management physician. (Tr. 270).   Again, he opined he did not think a Carticel reimplantation procedure or further arthroscopic procedures would help Plaintiff.  (Tr. 270).  Dr. Tandron kept Plaintiff at TTD work status until evaluation by a pain management physician.  (Tr. 270).

On March 27, 2003, during Plaintiff's last appointment with Dr. Salahi, Dr. Salahi again diagnosed Plaintiff with causalgia and recommended he continue with medication pain management.  (Tr. 143).  Plaintiff returned to Dr. Tandron on July 8, 2003, continuing to complain of persistent pain.  (Tr. 269).  Dr. Tandron noticed quadricep atrophy and believed Plaintiff was suffering from some type of RSD variant.  (Tr. 268). He recommended Plaintiff be treated by a physiatrist and undergo chronic pain management.  (Tr. 268).  Dr. Tandron again noted Plaintiff's work status was TTD, but further noted his work status should be deferred to his ongoing treating management physician.[4]  (Tr. 268).

On December 12, 2003, Dr. Tandron assessed Plaintiff as having chronic pain syndrome, reflex sympathetic dystrophy variant.  (Tr. 269).  He again recommended palliative care and opined surgery would not help because Plaintiff will continue to have problems in the future with chronic RSD.  (Tr. 269).   He stated "I do not feel [Plaintiff] is employable at this point.  Hopefully with time his [RSD] will be able to be treated better

---

[4]Plaintiff did not have an ongoing pain management physician at this time because Plaintiff was no longer being treated by Dr. Salahi and Plaintiff had not been examined by a new pain management physician.

and he can become more functional." (Tr. 269).   He prescribed Plaintiff Lidoderm patches for pain. (Tr. 269).

Dr. Tandron injected Plaintiff with Lidocaine/DepoMedrol again on May 13 and May 21, 2004, and on June 4, 2004, in an attempt to ease his pain; however, Plaintiff felt no relief. (Tr. 264-65).   Plaintiff had diffuse tenderness in his knee and complained of knee and back pain. (Tr. 266).   Dr. Tandron again assessed Plaintiff as having patellofemoral crepitus and chronic regional pain syndrome. (Tr. 265).   Plaintiff's last visit to Dr. Tandron took place on June 18, 2004.   He noted Plaintiff was having difficulty ambulating and sleeping. (Tr. 263). He further noted Plaintiff had quadricep and calf atrophy and he recommended Plaintiff get another opinion from Dr. Shirley.  (Tr. 263). He opined the best management would be palliative care and long term pain management. (261-62).  Finally, he stated Plaintiff's TTD work status is unchanged. (Tr. 262).

Dr. Paul D. Shirley conducted an independent medical evaluation on Plaintiff on September 27, 2004. (Tr. 291-94).  Dr. Shirley noted Plaintiff complained of left knee, hip and lower back pain. (Tr. 291).  On examination, Dr. Shirley noted tenderness of his LS spine with limitation in forward flexion and mild spasm. (Tr. 292).  He further noted two inches of muscular atrophy above his knee, no effusion, and chronic discoloration about the patella. (Tr. 292).  Dr. Shirley found Plaintiff's knee tender and opined Plaintiff had a contusion of the knee, developed neuromas, and a chondral injury to the hyaline cartilage. (Tr. 292).

Dr. Shirley agreed with Dr. Tandron that further surgery would not be beneficial to Plaintiff; however, Dr. Shirley believed testing Plaintiff with an EMG/NCV block could

prove beneficial.  (Tr. 293).  Dr. Shirley also recommended continuing Plaintiff on

medications -- i.e., the Lidoderm patch with the addition of an interferential stem unit to

help neuropathic pain and stimulate the muscle -- as well as use of a Protonics brace.

(Tr. 293).  Ultimately, Dr. Shirley opined:

> [Plaintiff] does have a significant permanent partial impairment from both
> the atrophy and pain patterns that continue to limit him and I feel prevent
> him from doing heavy labor.  I do feel he could do sedentary activities if he
> could get this burning back pain under control . . . .

(Tr. 293).

In addition to reports from treating and examining physicians, the record also

contains residual functional capacity ("RFC") assessments from two non-examining

state agency physicians.  Both state agency physicians found Plaintiff not disabled.  (Tr.

158-65; 180-87).

On December 20, 2004, Plaintiff attended a hearing in front of the ALJ and

testified regarding the severity of his pain.  (Tr. 305-341).  During the hearing, after

Plaintiff's counsel represented to the ALJ that Dr. Tandron had placed Plaintiff on TTD

work status, the ALJ noted that it was unclear if Dr. Tandron considered Plaintiff not

capable of any work or whether Plaintiff could still perform sedentary work.  The ALJ

gave Plaintiff's counsel permission to question Dr. Tandron regarding this issue.  (Tr.

310),  On January 3, 2005, in response to this question by Plaintiff's counsel, Dr.

Tandron clarified that he did not feel Plaintiff was capable of working even a full time

sedentary job.  (Tr. 296).

###    C.    <u>Summary of the ALJ's Decision</u>

A plaintiff is entitled to disability benefits when he is unable to engage in

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § § 404.1520, 416.920.  First, if Plaintiff is working at a substantial gainful activity, he is not disabled.  29 C.F.R. § 404.1520(b).  Second, if Plaintiff does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if Plaintiff's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).  Fourth, if Plaintiff's impairments do not prevent him from doing past relevant work, he is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if Plaintiff's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden of persuasion through step four, while at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

In the instant case, the ALJ determined Plaintiff met the nondisability requirements of the Act and was insured for benefits through December 31, 2002.  (Tr. 16).  At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 17, 23).  At step two, the ALJ found Plaintiff's back and knee pain, and affective disorder resulting in mild restrictions of activities of daily living, mild difficulties maintaining social functioning, moderate difficulties maintaining

concentration, persistence or pace "severe" based on the requirements in 20 C.F.R. § 404.1520(c).  (Tr. 20, 23).  At step three, the ALJ determined Plaintiff did not have an impairment, or any combination thereof, which met or equaled one of the impairments listed in Appendix 1, Subpart P of Regulation No. 4.  (Tr. 20, 23).

In determining Plaintiff's RFC, the ALJ represented he considered all of Plaintiff's symptoms, including pain, the objective medical evidence and other evidence, as well as medical opinions.  (Tr. 20).  The ALJ found Plaintiff had the RFC to:

> sit for a total of 8 hours, 30 minutes at a time, alternating with standing for 1 to 2 minutes every 30 minutes.  He can stand or walk for 15 minutes at a time, for a total of 2 hours in an 8-hour workday, using a crutch if walking more than a few feet. [Plaintiff] can lift 20 pounds occasionally and 10 pounds frequently (and if standing, no more than 15 pounds occasionally). He can occasionally bend, stoop or climb stairs.  He is restricted from climbing ladders, ropes or scaffolds, and from crouching, crawling or kneeling. [Plaintiff's] impairments further result in occasional lapses in concentration, persistence and pace.  Thus, [Plaintiff] retains the [RFC] to perform a range of sedentary work activity.

(Tr. 20). Therefore, in determining Plaintiff's RFC, the ALJ rejected Plaintiff's allegation that he was incapable of any work.  (Tr. 20).  Rather, the ALJ found "the degree of pain and limitation alleged by [Plaintiff] is simply not supported by the weight of the medical evidence."  (Tr. 20).  The ALJ noted a statement by Plaintiff's treating physician, Dr. Tandron, that Plaintiff could not work even a sedentary job for an 8 hour day; however, he rejected Dr. Tandron's opinion because he found the weight of the medical evidence showed Plaintiff was physically and mentally capable of performing sedentary work activity.  (Tr. 20-21).

Because the ALJ found Plaintiff capable of performing a range of sedentary work, but not the full range, the ALJ utilized a vocational expert ("VE") to testify as to whether

Plaintiff was able to return to his past relevant work or perform other work.  (Tr. 21).

The VE testified that based on Plaintiff's exertional and non-exertional limitations

imposed by Plaintiff's RFC, Plaintiff was unable to perform his past relevant work and

therefore, at step 4 the ALJ found Plaintiff incapable of performing his past relevant

work.  (Tr. 22).

At step 5, the ALJ noted Plaintiff was unable to perform the full range of

sedentary work because he is:

> limited to lifting 15 pounds while standing, requires the ability to alternate
> between sitting and standing, requires the use of a crutch for prolonged
> walking, is restricted from crouching, kneeling, crawling and climbing
> ladders, scaffolds and ropes, and has occasional lapses in concentration,
> persistence and pace.

(Tr. 22).  As such, the ALJ questioned the VE as to whether jobs exist in the national

economy for Plaintiff despite the limitations mentioned above.  The VE testified Plaintiff

could perform the following four sedentary jobs: information clerk; surveillance systems

monitor; charge account clerk; and call-out operator.  (Tr. 22, 23-24).  Further, the VE

testified each of these jobs existed in significant numbers in the national economy and

more specifically, in the region.  Thus, the ALJ found Plaintiff capable of making a

successful adjustment to work that exists in significant numbers in the national economy

and therefore, not disabled.  (Tr. 22, 24).  Additionally, the ALJ found Plaintiff had not

been under a disability at any time through the date of his Decision.  (Tr. 22, 24).

## III.    THE STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ

applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir.

1988), and whether the findings are supported by substantial evidence.  Richardson v.

Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971).  The Commissioner's findings of fact

are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial

evidence is more than a scintilla -- i.e., the evidence must do more than merely create a

suspicion of the existence of a fact, and must include such relevant evidence as a

reasonable person would accept as adequate to support the conclusion.  Foote v.

Chater, 67 F.3d 1553, 1560 (11th Cir. 1995), citing Walden v. Schweiker, 672 F.2d 835,

838 (11th Cir. 1982) and Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.  Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991);

Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view

the evidence as a whole, taking into account evidence favorable as well as unfavorable

to the decision.  Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837

(11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

factual findings).

## IV.   ANALYSIS

Plaintiff argues two issues on appeal.  First, Plaintiff asserts the ALJ erred by

failing to give proper weight to the opinion of Plaintiff's treating physician.  (Doc. 16).

Second, he contends the ALJ erred by failing to properly evaluate Plaintiff's credibility

regarding his pain and limitations.  Id.  As such, Plaintiff contends the Commissioner's

decision is not supported by substantial evidence as required by 42 U.S.C. § 405(g).  Id.

In determining Plaintiff is not disabled, the ALJ combined his reasoning for rejecting both the opinion of Plaintiff's treating physician, Dr. Tandron, and Plaintiff's allegations of pain. The ALJ combined his analysis, presumably, because Dr. Tandron based his opinion that Plaintiff could not work a full 8 hour day on the fact that Plaintiff's chronic pain prevented him from working. Because Plaintiff argues the ALJ's decision, with respect to both issues, is not supported by substantial evidence, and because both issues involve the same analysis by the ALJ, the Court will address the two issues together.

### A.    The Pain Analysis

During the hearing, Plaintiff testified he feels intense pain in his lower back and throughout his left leg. (Tr. 318). He further testified his pain prevents him from working, even in a sit down job. (Tr. 321). Out of a ten point scale, Plaintiff estimated his back and knee pain were about an eight or nine. (Tr. 322, 325). Plaintiff also testified he has back spasms on a daily basis and constant knee pain. (Tr. 322, 325).

The ALJ must consider all of Plaintiff's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain or other symptoms alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably

expected to give rise to the alleged pain.

Foote, 67 F.3d at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).

It is sufficient to support a finding of disability when Plaintiff's subjective testimony is

supported by medical evidence that satisfies the standard in this case.  Id.

Here,  the ALJ determined Plaintiff's back and knee pain were severe

impairments and therefore, Plaintiff has satisfied the first part of the test.  (Tr. 20).   As

for the second part, the ALJ specifically found "the degree of pain and limitation alleged

by [Plaintiff] is simply not supported by the weight of the medical evidence."  (Tr. 20).

"When the objective medical evidence does not confirm the severity of the alleged pain,

the question becomes whether the underlying medical condition could reasonably be

expected to give rise to the alleged pain."  Geiger v. Apfel, 2000 WL 381920 *7 (M.D.

Fla. 2000).  The ALJ, however, did not make a specific finding regarding whether

Plaintiff's symptoms were such that they could be reasonably expected from Plaintiff's

medical condition.

Where an ALJ decides not to credit a claimant's testimony about pain and

subjective allegations, the ALJ must articulate specific and adequate reasons for doing

so, or the record must be obvious as to the credibility finding.  Jones v. Department of

Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons

must be based on substantial evidence).  A reviewing court will not disturb a clearly

articulated credibility finding with substantial supporting evidence in the record.  Hale v.

Bowman, 831 F.2d 1007, 1012 (11th Cir. 1987).  A lack of a sufficiently explicit credibility

finding becomes a ground for remand when credibility is critical to the outcome of the

case.  Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

14

The ALJ recognized Plaintiff had pain and limitations resulting from his severe impairments, but nevertheless concluded "the degree of pain and limitation alleged by [Plaintiff] is simply not supported by the weight of the medical evidence." (Tr. 20).   The ALJ stated he considered "Plaintiff's allegation that he is incapable of any work due to his impairments" and found such allegation unpersuasive.  (Tr. 20).   In articulating his reasons for rejecting Plaintiff's allegations of pain, the ALJ devoted a significant portion of his analysis to rejecting the medical opinion of Dr. Tandron, Plaintiff's orthopedic surgeon.  Thus, the Court will now discuss whether the ALJ afforded the proper weight to the opinion of Dr. Tandron, Plaintiff's treating physician.

### B.   The Treating Physician Analysis

Plaintiff argues the ALJ's analysis as to why he rejected Dr. Tandron's opinion is not supported by substantial evidence.  (Doc. 16, p. 14).  Specifically, Plaintiff argues the ALJ erred by failing to give proper weight to Dr. Tandron's opinion that Plaintiff is incapable of performing any category of work activity, including sedentary, for an 8 hour day.  Id. at 16.  Plaintiff contends Dr. Tandron is a specialist in the field of orthopedics who has treated Plaintiff since June 2001 and as such, the ALJ should have given Dr. Tandron's opinion controlling weight.  Id. at 17.

Plaintiff is correct that the opinion of a treating physician, such as Dr. Tandron, "'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'"  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (citing, Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)).  The Eleventh Circuit has determined "good cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2)  evidence supported a contrary finding; or (3) treating physician's opinion

15

was conclusory or inconsistent with the doctor's own medical records." Phillips, 357 F.3d at 1241.

If the ALJ determines a treating physician's opinion does not warrant controlling weight, the ALJ must weigh the medical opinion based on the following six factors: the length of the treatment relationship and the frequency of the examinations; the nature and extent of the treatment relationship; the medical evidence supporting the opinion; consistency with the record as a whole; specialization in the medical issues at issue; and any other factors which tend to support or contradict the opinion. Hurley v. Barnhart, 385 F. Supp. 2d 1245, 1255 (M.D. Fla. 2005) (citing 20 C.F.R. § 404.1527(d)). In any event, whenever an ALJ decides to disregard the opinion of a treating physician, he/she must clearly articulate the reasons for so doing. Phillips, 357 F.3d at 1241.

The ALJ articulated the following six reasons for rejecting Dr. Tandron's opinion: (1) Dr. Switzer reported Plaintiff's x-rays and MRIs were "essentially normal" and Plaintiff's knee also appeared normal on examination; (2) before performing arthroscopy on Plaintiff's knee, Dr. Tandron opined Plaintiff could perform sedentary work; (3) subsequent to Plaintiff's surgery, Dr. Tandron opined further surgery would not benefit Plaintiff and instead, he recommended conservative treatment, including ongoing palliative care; (4) Dr. Salahi opined Plaintiff could perform light work; (5) Dr. Tandron deferred Plaintiff's work status to his ongoing treatment management physician; and (6) Dr. Tandron recommended Plaintiff use a crutch to assist him in ambulating. (Tr. 20-21). The Court finds the ALJ's reasons, whether analyzed separately or together, do not show good cause for rejecting Dr. Tandron's opinion. The Court will address each of the ALJ's reasons in more detail below.

16

### 1.      Dr. Switzer's Findings

The ALJ's initial reason for rejecting Dr. Tandron's opinion and Plaintiff's allegations of pain is because "Dr. Switzer reported Plaintiff's x-rays and MRIs were essentially normal" and Dr. Switzer opined on examination that Plaintiff's "knee revealed no effusion, was stable, and that his patella appeared to be tracking normally."  (Tr. 20). While the ALJ is correct in his restatement of Dr. Switzer's findings, Dr. Switzer also opined Plaintiff suffered from a very painful symptomatic plica.  (Tr. 113).  Dr. Switzer recommended Plaintiff's knee be arthroscoped and believed Plaintiff would see marked results.  (Tr. 113).  In fact, Dr. Tandron, Plaintiff's treating orthopedic surgeon, sought a second opinion as to whether arthroscopy would benefit Plaintiff.  (Tr. 252).  Dr. Tandron acknowledged Dr. Switzer's findings and agreed to perform arthroscopy on Plaintiff's knee after considering such opinion.  (Tr. 250).  Thus, the ALJ ignored both Dr. Switzer's statements with regard to Plaintiff's pain and his recommendation that Plaintiff have his knee arthroscoped.  Clearly, Dr. Switzer did not feel Plaintiff's knee was "normal" or he would not have recommended arthroscopy.  Moreover, the ALJ acknowledged Plaintiff's knee was not normal when he determined Plaintiff's knee pain was a "severe" medically determinable impairment.  (Tr. 20).

### 2.      Dr. Tandron's Initial Finding that Plaintiff Could Perform Sedentary Work

In rejecting Dr. Tandron's opinion that Plaintiff cannot work, the ALJ noted Dr. Tandron initially opined Plaintiff could perform sedentary work before November 2001 -- the date Dr. Tandron performed an arthroscopy on Plaintiff's knee.  Although Dr. Tandron felt Plaintiff was capable of performing sedentary work before he underwent

17

arthroscopy of his knee, the medical records demonstrate Plaintiff's pain intensified subsequent to the surgery.  (Tr. 262-288).  Just prior to the surgery, Dr. Tandron placed Plaintiff on TTD work status.  (Tr. 279).  Immediately following surgery, Dr. Tandron opined Plaintiff would probably need at least 3 months therapy to recover from the surgery (Tr. 279); however, Plaintiff's condition gradually worsened over the next few months, followed by years, despite therapy and pain management.  (Tr. 262-278).  Dr. Tandron never changed Plaintiff's work status from anything other than TTD.  Moreover, on two separate occasions, Dr. Tandron specifically stated he believed Plaintiff was incapable of working.  (Tr. 267, 296).  Therefore, the fact that Dr. Tandron initially found Plaintiff capable of performing sedentary work is not contradictory nor inconsistent with Dr. Tandron's later opinion finding Plaintiff incapable of performing any kind of work.

### 3.    Dr. Tandron's Recommendation of Conservative Treatment as Opposed to Surgery

The ALJ pointed to Dr. Tandron's belief, that additional surgery on Plaintiff's knee was unnecessary, as support for finding Dr. Tandron's opinion on Plaintiff's work status contradictory and inconsistent with the medical evidence.  This Court finds fault with the ALJ's reasoning.  Notably, Dr. Tandron did not recommend additional surgery on Plaintiff's knee because he determined it would not be beneficial.  Dr. Tandron believed Plaintiff suffered from RSD which would cause Plaintiff continued problems in the future even if he were to have a total knee replacement.  (Tr. 267).  Additionally, Dr. Tandron opined Plaintiff should be treated by a phsyiatrist[5] and undergo chronic pain

---

[5]A physiatrist is a physician who specializes in physical medicine and rehabilitation.  Physiatrists are specialists in the treatment of patients of all ages in the diagnosis and treatment of musculoskeletal injuries and pain syndromes, as well as the rehabilitation of patients with severe impairments.  See Association of Academic

management for RSD.

Dr. Tandron's recommendation as to how to treat Plaintiff's knee does not demonstrate Plaintiff's injury was not severe, as the ALJ seems to suggest.  Rather, Dr. Tandron considered the likelihood of success in determining a treatment plan and whether additional surgery would be beneficial for Plaintiff.  Dr. Tandron's records demonstrate he did not think surgery would alleviate Plaintiff's pain; they are not, however, contradictory or inconsistent with Dr. Tandron's opinion Plaintiff is incapable of working.

### 4.    Dr. Salahi's Findings

Next, the ALJ pointed to Dr Salahi's belief that Plaintiff was capable of performing light work as support for not giving substantial weight to Dr. Tandron's opinion.  While the Court finds this fact relevant, the ALJ failed to mention Dr. Salahi's findings which consistently document Plaintiff's chronic pain.  Notably, Dr. Salahi treated Plaintiff from July 2002 through March 2003 and during each visit, beginning with Plaintiff's initial visit through his last, Dr. Salahi noted Plaintiff complained of constant pain with burning and/or ice cold sensations.  (Tr. 143-157).  Dr. Salahi administered lumbar sympathetic blocks in an effort to relieve such pain, however, the injections did not alleviate the pain. (Tr. 145).  Rather, Plaintiff's pain continued and actually increased.  (Tr. 143-145).

On October 16, 2002, Dr. Salahi filled out a Work Status Form and opined Plaintiff could do light work which consisted of exerting up to 20 pounds of force occasionally or up to 10 pounds of force frequently, or a negligible amount of force

Physiatrist website, www.physiatry.org/field/index.html (last visited on Aug. 21, 2006).

constantly to move objects.  (Tr. 144).  Notably, light work as defined on Dr. Salahi's medical form has a different definition than light work as defined by the Social Security Act.  The Act defines light work as requiring a good deal of walking or standing, or involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 CFR § 404.1567; see also Social Security Ruling 83-10 (defining light work as a job that requires a good deal of walking or standing).  On the Work Status Form, Dr. Salahi noted that Plaintiff should not stand for prolonged periods, however, he did not list specifics regarding this additional limitation.   Earlier, however, Dr. Salahi noted standing and sitting exacerbates Plaintiff's pain.  (Tr. 150).  Thus, it is not entirely clear if Dr. Salahi would have opined Plaintiff could do light work, as defined by the Act.

While the ALJ did not err by noting Dr. Salahi's opinion that Plaintiff was capable of performing light work, this fact is not dispositive when considered in light of the fact that Dr. Salahi's "light work" definition is not consistent with the definition under the Social Security Regulations.  Moreover, because the ALJ failed to mention Dr. Salahi's documentation of Plaintiff's pain, as well as Dr. Tandron's ongoing relationship with Plaintiff and his consistent documentation of Plaintiff's pain, it is unclear if the ALJ considered these factors in determining Plaintiff is not disabled.

### 5.    Dr. Tandron's Deferral of Plaintiff's Work Status

In attempting to discredit Dr. Tandron's opinion regarding Plaintiff's work status, the ALJ points out that in July 2003, Dr. Tandron deferred Plaintiff's work status to Plaintiff's ongoing treatment management physician.  Beginning on November 26, 2001 -- immediately prior to performing arthroscopy on Plaintiff -- Dr. Tandron placed Plaintiff on TTD and kept him at this work status until March 4, 2003, at which time Dr. Tandron

20

deferred Plaintiff's work status to his previous treating pain management physician, Dr. Salahi.  Notably, the only time Dr. Salahi issued an opinion concerning Plaintiff's work status was in October 2002 -- six months prior to the date Dr. Tandron deferred Plaintiff's work status to Dr. Salahi.   Interestingly, also on March 4, 2003, Dr. Tandon suggested Plaintiff seek reevaluation by another pain management physician because Plaintiff complained his pain management had not helped and because Plaintiff's leg was getting weaker.  (Tr. 269).

On July 8, 2003, Dr. Tandron again noted Plaintiff's work status should be deferred to his ongoing treating management physician.  (Tr. 268).  At that time, however, Plaintiff was not seeing a pain management physician.[6]  On December 12, 2003, Plaintiff returned to Dr. Tandron's office and Dr. Tandron noted Plaintiff had been discharged from Dr. Salahi's care, as he was told there was nothing more Dr. Salahi could do for him.  (Tr. 267).  Upon examination, Dr. Tandron opined Plaintiff had "certainly not improved" and he further opined Plaintiff was not employable.  (Tr. 267).

Dr. Tandron believed Plaintiff suffered from chronic reflex dystrophy and that once this was treated better by a physiatrist, Plaintiff could become more functional.  (Tr. 267).   Dr. Tandron, however, continued to treat Plaintiff through June 2004, all the while noting Plaintiff continued to feel intense pain in both his knee and back.  In fact, in May and June of 2004, Dr. Tandron injected Plaintiff with Lidocaine shots in an attempt to alleviate his pain; however, Plaintiff's pain continued.  (Tr. 263-65).   In June 2004, Dr. Tandron noted Plaintiff would be better helped by a physiatrist and another pain

---

[6]The last time Plaintiff received treatment from Dr. Salahi was on March 27, 2003.

management specialist. (Tr. 263).  He also recommended Plaintiff see Dr. Paul Shirley

for another opinion.  (Tr. 263).  Finally, on January 3, 2005, Dr. Tandon responded to a

letter from Plaintiff's attorney, asking whether he believed Plaintiff could work a

sedentary job on a full time basis for the period in which he treated Plaintiff.  Dr.

Tandron opined Plaintiff was incapable of working an 8 hour day, including sedentary

work.  (Tr. 296).

The fact that Dr. Tandron deferred Plaintiff's work status to a pain management

physician does not persuade this Court that Dr. Tandron's opinion -- namely, that

Plaintiff is and was incapable of working -- is inconsistent or not supported by the

medical evidence.  From the date he performed arthroscopy on Plaintiff, throughout his

entire course of treatment of Plaintiff, Dr. Tandron consistently opined Plaintiff was

unable to work.  Specifically, from November 2001 through December 31, 2002 --

Plaintiff's last insured date -- Dr. Tandron never took Plaintiff off TTD work status.

Further, Dr. Tandron consistently documented Plaintiff's pain as significant and chronic.

### 6.    Dr. Tandron's Recommendation that Plaintiff Use a Crutch to Assist Him in Ambulating

The ALJ's final reason for rejecting Dr. Tandron's opinion was because Dr.

Tandron recommended Plaintiff use  a crutch to assist him in ambulating.  The Court

cannot see any reason why this fact shows Dr. Tandron's findings are inconsistent or

not supported by the objective medical evidence.

As stated above, the Court finds the ALJ failed to show good cause why Dr.

Tandron's opinion should be rejected.  The ALJ set forth various reasons for rejecting

Dr. Tandron's opinion, some which make more sense than others; however, when

22

considered carefully, none of his reasons persuade the Court that Dr. Tandron's opinion is contradictory or inconsistent with the medical evidence.

### C.   Whether Additional Medical Evidence Supports the ALJ's Finding that Plaintiff is Not Disabled?

Because the Court is not persuaded the ALJ articulated good cause for rejecting Dr. Tandron's opinion, the case should be remanded; however, the Court will assess whether the remainder of the medical evidence supports the ALJ's decision to discredit Plaintiff's allegations of pain.  The ALJ found Plaintiff's credibility and pain testimony were not supported by the objective evidence.  In addition to rejecting Dr. Tandron's opinion, the ALJ articulates two additional reasons for discrediting Plaintiff's allegations of pain.  First, he cites Dr. Shirley's opinion and states Dr. Shirley found Plaintiff capable of performing sedentary work.  Next, the ALJ points to the opinions of the state agency physicians that Plaintiff is not disabled.  The Court finds the ALJ erred in his analysis of the objective medical evidence.

### 1.   Dr. Shirley's Opinion

The ALJ represented he gave greater weight to the opinion of Dr. Shirley, a consultative physician, than to that of Dr. Tandron.  (Tr. 21).  He stated Dr. Shirley's findings and opinions support a finding that Plaintiff's RFC is sedentary.  (Tr. 21).  Unfortunately, the ALJ omitted an important aspect of Dr. Shirley's findings and opinions.  Specifically, Dr. Shirley opined Plaintiff can perform sedentary work "if he could get his burning back pain under control . . . ."  (Tr. 293).   Dr. Shirley's opinion makes it clear he believed Plaintiff may be capable of performing sedentary work at some later date in the future, but contrary to the ALJ's assertion, he did not opine

Plaintiff was capable of performing sedentary work at the point in time that he examined Plaintiff.  This is a significant distinction and the ALJ erred in failing to mention it.  The ALJ cannot simply ignore evidence which does not support his conclusion.

### 2. The State Agency Physicians' Opinions

Finally, the ALJ credited the opinions of the state agency physicians who found Plaintiff not disabled.  "Taken alone, the opinion of a non-examining physician does not constitute substantial evidence to support the Commissioner's decision.  However, the ALJ may consider the reports and assessments of state agency physicians as expert opinions." Ogranaja v. Commissioner of Social Security, No. 05-12916, 2006 WL 1526062, *2 (11th Cir. June 5, 2006) (quoting Swindle v. Sullivan, 914 F.2d 222, 226 n.3) (11th Cir. 1990) and 20 C.F.R. §416.927(f)(2)(i)).  Because the Court finds this case should be remanded due to the ALJ's failure to adequately discuss the issue of Plaintiff's pain, as well as his failure to show good cause for rejecting Dr. Tandron's opinion, the Court does not need to determine what weight should have been given to the state agency physicians' findings.

The ALJ should have considered the evidence as a whole, including Plaintiff's own allegations and his physicians' findings concerning his pain.  The record is replete with references of Plaintiff's pain -- more so with respect to his knee pain than his back pain.  Yet, the ALJ failed to discuss the extent of Plaintiff's pain as noted by Dr. Switzer, Dr. Tandron, Dr. Salahi, and Dr. Shirley.  In fact, he failed to address the entire issue of pain in his Decision with the exception of making an overly broad statement that Plaintiff has some pain and limitations which are not supported by the evidence.  Notably, the ALJ focused his analysis on the evidence which favored his conclusion, and simply

24

ignored the evidence which did not.  Thus, the Court is unable to determine whether the ALJ's Decision is supported by substantial evidence.  Moreover, the Court is unable to determine how much weight the ALJ gave to the opinions of Plaintiff's treating and examining physicians, specifically with respect to their findings regarding Plaintiff's back and knee pain.

While the ALJ need not accept Plaintiff's complaints of disabling pain as true, on remand the ALJ should consider Plaintiff's complaints and insure that any reason for discrediting them is supported by substantial evidence.  If any one reason alone serves as a sufficient basis for rejecting Plaintiff's allegations of pain, the ALJ should indicate so.  Furthermore, if the ALJ determines Plaintiff's knee or back pain is or was disabling at any point, the ALJ should make a specific determination as to whether Plaintiff was disabled at any time during the period for which he was insured.

Finally, in light of the fact the ALJ failed to provide good cause in rejecting Dr. Tandron's opinion, on remand the ALJ should also reconsider the weight Dr. Tandron's opinion is entitled.  He should take the following six factors into account: the length of the treatment relationship and the frequency of the examinations; the nature and extent of the treatment relationship; the medical evidence supporting the opinion; consistency with the record as a whole; specialization in the medical issues at issue; and any other factors which tend to support or contradict the opinion.  Hurley v. Barnhart, 385 F. Supp. 2d 1245, 1255 (M.D. Fla. 2005) (citing 20 C.F.R. § 404.1527(d)).  If on remand the ALJ decides to reject Dr. Tandron's opinion, he should set forth good cause for doing so.

## V.    CONCLUSION

For the foregoing reasons, the undersigned believes the Commissioner's

decision is not supported by substantial evidence, nor decided according to the proper

legal standards, and is therefore **REVERSED** and **REMANDED** pursuant to sentence

four, 42 U.S.C. 405(g).  On remand, the ALJ shall (1) reconsider Plaintiff's complaints of

disabling pain, as well as Plaintiff's physicians' documentation of such complaints, and if

he decides to discredit such allegations, he should insure that any reason for

discrediting them is supported by substantial evidence; and (2) reconsider the weight

Dr. Tandron's opinion is entitled.  The Clerk of the Court is directed to enter judgment

consistent with this opinion and, thereafter, to close the file.

 

**DONE AND ORDERED** at Jacksonville, Florida, this __4th__ day of October, 2006.

_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record